UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Brendan M. Shelley, being duly sworn, depose and state as follows:

## I. INTRODUCTION

1. I am a Special Agent employed by the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE). I am assigned to ICE Homeland Security Investigations (HSI) – Washington, D.C. I have been employed as a Special Agent with ICE since October 2007. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the ICE Special Agent Training Program. My duties as a Special Agent for ICE include investigating administrative and criminal violations of the Immigration and Nationality Act, United States customs laws and other federal criminal violations to include wire fraud, bank fraud and money laundering. Prior to becoming a Special Agent, I was an ICE Management and Program Analyst with ICE's Office of the Principal Legal Advisor.

2. This affidavit is submitted in support of a criminal complaint and arrest warrant charging that from in or about January 2014 through in or about October 2014, within the District of Columbia and elsewhere, the defendant Hussein Fadl Osman, conspired to violate Title 18, United States Code, Section 1956(h). Specifically, as set forth below, there is probable cause to believe that Osman and others did knowingly and intentionally conspire with other persons known and unknown to knowingly conduct or attempt to conduct financial transactions with property representing the proceeds of specified unlawful activities knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity in violation

of 1956(a)(1)(B)(i), and that the criminally derived property involved in several of the individual transactions was of a value greater than $10,000 and was derived from specified unlawful activities in violation of 18 U.S.C. § 1957. Probable cause also exists to establish that the specified unlawful activities engaged in by Osman and his co-conspirators include that 1) the co-conspirators willfully and knowingly devised a scheme to obtain money and property by means of false pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud, knowingly and intentionally caused to be transmitted by means of wire in interstate commerce writings, signs, and signals for the purpose of executing such scheme and artifice to defraud in violation of Title 18 United States Code, Section 1343; and 2) the defendants knowingly and willfully carried out a scheme to obtain money or property owned by or under the custody and control of Bank of America for the benefit of the Kuwaiti Health Ministry by false and fraudulent pretenses in violation of Title 18 United States Code, Section 1344(2).

3. This affidavit is based on my personal observations during the course of this investigation, information conveyed to me by other law enforcement officials, my review of records, documents and other physical evidence obtained during this investigation and interviews of witnesses. This affidavit contains information necessary to support a finding of probable cause, but does not include each and every fact observed by me or known by the government.

**II. THE DEFENDANT**

4. According to records maintained by the U.S. Department of Homeland Security (DHS), Hussein Fadl Osman is an adult male who was born in Sudan. DHS records indicate that Osman reported his date of birth as [redacted]. Osman is a naturalized citizen of the United

States. According to bank records, Osman previously reported an address of 4702 Rouge Court in Alexandria, Virginia.

## III. BACKGROUND INFORMATION

5. According to open sources, the State of Kuwait operates embassies throughout the world, including an embassy located in Washington, D.C. The Embassy of Kuwait in Washington, D.C. operates the Kuwait Embassy Health Ministry (also known as the Kuwait Health Office, also known as the Kuwait Health Division, herein referred to as Heath Ministry). The Health Ministry is located at 4301 Connecticut Avenue, NW, Suite 330 in Washington, D.C.

6. According to open sources and a witness interview described below, the mission of the Health Ministry is to pay for health care costs incurred by Kuwaiti nationals receiving medical treatment in the United States. Kuwaiti citizens requiring medical attention sometimes travel to foreign countries in order to receive medical attention. The Health Ministry's core responsibilities are to 1) coordinate care provided by medical service providers, 2) arrange for medical care providers to be paid with government funds for services provided, and 3) pay patients and their families a bi-weekly stipend for travel and living expenses. All expenses associated with the operation of the Health Ministry are paid for by the Government of Kuwait.

7. According to interviews of a witness and other evidence described below, in 2014, the Health Ministry office located in Washington, D.C. was overseen by a Senior Health Ministry official and a Financial Attaché Hanan Al Sharaf.

8. According to Bank of America records, the Health Ministry has maintained a Bank of America bank account in Washington, D.C. for at least two years, including throughout 2014. The account is funded each month by wire transfers originating from the Kuwaiti government.

## IV. THE CONSPIRACY

9. As set forth in this affidavit, there is probable cause to believe that the co-conspirators identified herein, including Osman, knowingly conspired to enrich themselves by embezzling funds from the Bank of America bank account owned by the Kuwaiti government's Health Ministry.

10. The ways, manner and means by which the conspiracy was carried out included the following:

a. It was part of the conspiracy that members of the conspiracy would use checks drawn on the Health Ministry's bank account in order to make unauthorized payments to companies that did not provide any services (the "shell companies").

b. It was further part of the conspiracy that members of the conspiracy would create shell companies, using names that closely resembled actual health care providers to make them appear legitimate, in order to conceal embezzlement activity.

c. It was further part of the conspiracy that members of the conspiracy would open bank accounts for the shell companies to deposit checks payable to the shell companies drawn on the Health Ministry funds in order to conceal and embezzle funds.

d. It was further part of the conspiracy that members of the conspiracy would transfer embezzled funds from the shell company accounts to the bank accounts of other members of the conspiracy, and distribute embezzled funds in cash payments.

e. It was further part of the conspiracy that members of the conspiracy would access transaction records of the Health Ministry, including invoices and payment records, in order to edit information associated with prior payments.

f. It was further part of the conspiracy that members of the conspiracy attempted to conceal their embezzlement of funds by depositing checks issued by the shell companies into the Health Ministry account.

11. As set forth in this affidavit, more than sufficient probable cause exists to believe that the co-conspirators agreed to embezzle approximately $2 million in Health Ministry Funds.

The financial records reviewed to date reveal that at least $1.4 million was paid by the Health Ministry to the co-conspirators through shell companies.

12. As set forth below, there is more than sufficient probable cause to believe that Osman's role in the conspiracy included, among other things opening a bank account for one of the shell companies, depositing checks from the Health Ministry into the shell company bank account, withdrawing cash from the shell company bank account to pay other members of the conspiracy and writing checks from the shell company bank account to other members of the conspiracy. There is also probable cause to believe Osman received a portion of the embezzled funds.

## V. PROBABLE CAUSE

### A. INFORMATION PROVIDED BY SOURCE OF INFORMATION 1

13. In November 2014, ICE HSI was contacted by a source of information (herein referred to as SI-1) concerning suspected embezzlement activity at the Health Ministry in Washington, D.C. SI-1 was previously employed as an accountant with the Health Ministry from approximately June 2013 until September 2014. SI-1 stated SI-1 had knowledge of Health Ministry employees who were embezzling Health Ministry funds and laundering the stolen money using various shell corporations.

14. On November 3, 2014 and again on February 26, 2015, I interviewed SI-1. SI-1 stated in sum and in substance:

a. SI-1 was previously employed by the Health Ministry from approximately June 2013 until September 2014;

b. SI-1 reported to the Finance Attaché, Hanan Al Sharaf;

c. the mission of the Health Ministry is to pay for the health care costs incurred by Kuwaiti nationals receiving approved medical treatment in the United States;

d. it was not uncommon for Kuwaiti nationals to travel to foreign countries, including the United States, in order to receive medical treatment;

e. Kuwait operates health ministry offices in several foreign countries, including the United States;

f. Kuwaiti nationals seeking medical attention in the United States work with the Health Ministry to obtain a letter guarantying payment of expenses for treatment of the person to be issued to the hospital providing the medical care;

g. the hospitals bill the Health Ministry directly;

h. the Health Ministry pays the hospital with funds provided by the Kuwaiti government;

i. all payments for medical care are paid with funds from the Health Ministry's bank account;

j. the Health Ministry's bank account is funded each month with a wire transfer from the Government of Kuwait;

k. the wire transfers typically range from $25 million to $30 million dollars each month, but additional funds can be wired depending on the number of people needing medical assistance or other expenses;

l. the Health Ministry maintains a bank account at a Bank of America branch located in the Van Ness neighborhood of Washington, D.C.;

m. Health Ministry employees are paid by check from the Health Ministry's Bank of America bank account;

n. SI-1 was originally hired to work at the Health Ministry as an accountant and was later tasked by Al Sharaf with conducting an audit of the Health Ministry's expenses;

o. during SI-1's audit, SI-1 noticed the Health Ministry's computerized accounting system allowed users to manually edit information associated with previous transactions including a patient's name, the date of a payment, the payee's information and the amount of money paid;

p. SI-1 was concerned that individuals with access to the accounting system could conceal embezzlement activity by manipulating the information associated with the transactions;

q. SI-1 reported SI-1's concerns to a Senior Health Ministry official and Al Sharaf;

r. Al Sharaf subsequently hired another accountant herein referred to as Unindicted Co-Conspirator 1 (UCC-1);

s. prior to the hiring of UCC-1, Health Ministry checks were maintained in a central location in order to prevent unauthorized payments from being made;

t. UCC-1 removed the controls on the Health Ministry checks. After UCC-1 was hired, blank Health Ministry checks were not held in a central place but were generally accessible to employees;

u. SI-1 became aware in 2014, that numerous accusations, including accusations made by the Senior Health Ministry official, were made that Al Sharaf and UCC-1 were involved in embezzlement activity;

v. UCC-1 admitted orally to SI-1 to conspiring with others, including Al Sharaf, to embezzle money from the Health Ministry;

w. UCC-1 wrote a statement in which UCC-1 admitted to embezzling funds with Al Sharaf and others from the Health Ministry and gave a copy of the written statement to SI-1. SI-1 understood that the statement was requested by a Senior Health Ministry official;

x. SI-1 also witnessed Health Ministry employee, Walid Aly prepare a written statement in which Aly stated Aly had knowledge of UCC-1 operating UPMC, Hopiken and Med Star—the shell companies, among other things. SI-1 signed this statement as a witness;

y. Al Sharaf instructed SI-1 to call UCC-1 from SI-1's cell phone while in the Health Ministry Office, located in Washington, D.C. Al Sharaf then took the phone and placed it in speaker mode. SI-1 heard Al Sharaf ask UCC-1 for "the documents;"

z. SI-1 said that shortly thereafter, SI-1, and to SI-1's knowledge UCC-1 and Walid Aly, were all terminated from their employment in or about September 2014. SI-1 also believes that Al Sharaf was terminated as the Financial Attaché.

15. At the conclusion of the interview on November 3, 2014, SI-1 provided me with several documents, many of which were written in Arabic. One of the documents was a written statement dated September 17, 2014 which appeared to be signed by UCC-1. SI-1 advised me that this is a copy of the written statement that SI-1 saw UCC-1 author. One of the documents was a written statement dated September 12, 2014 which appeared to be signed by another

Health Ministry Office employee, Walid Aly. SI-1 advised me that this is a copy of the statement SI-1 observed Aly writing, and saw Aly sign.

16. On February 26, 2015, SI-1 correctly identified photographs of Al Sharaf, UCC-1, and Walid Aly after being shown headshot photographs, including a known photo of UCC-1 and a known photo of Aly and several others persons.

B. INFORMATION CONTAINED IN THE STATEMENT OF UCC-1

17. I requested translators assigned to the U.S. Citizenship and Immigration Services Language Services Section translate the various documents previously provided by SI-1. Based on my review of the certified translations of the documents, identified as the written statement of UCC-1, UCC-1 dated September 15, 2014, stated in sum and in substance:

a. UCC-1 had previously discussed an agreement with Al Sharaf under which UCC-1 would leave the Health Ministry so UCC-1 could open a business that would provide the Health Ministry with medicines;

b. Al Sharaf advised UCC-1 that UCC-1 could sell medicines while continuing to work at the Health Ministry;

c. Al Sharaf told UCC-1 that they (UCC-1 and Al Sharaf) could split any profits equally;

d. Al Sharaf wanted to make sure her name was not mentioned in any transactions so her involvement would not be known to third parties;

e. UCC-1 was directed by Al Sharaf to prepare invoices for services that were not provided to the Health Ministry and to issue checks in the name of third parties. Several of their conversations about this were conducted by writing on yellow paper, because according to UCC-1, she thinks her offices are under surveillance;

f. Al Sharaf wanted UCC-1 to provide her with $2 million dollars through the embezzlement scheme;

g. UCC-1 and Al Sharaf agreed Al Sharaf would receive $1 million in cash;

h. UCC-1 and Al Sharaf agreed to establish shell companies and to create fictitious bills from the shell companies to the Health Ministry;

i. UCC-1 and Al Sharaf agreed even though bills would be sent to the Health Ministry, no actual services would be provided;

j. UCC-1 was not afraid of getting in trouble because UCC-1's partner in the scheme was UCC-1's superior and the person who approved payments and signs checks;

k. the first shell company (MedStar) received approximately $200,000.00 in payments from the Health Ministry;

l. the second shell company (Hopiken) received approximately $300,000.00 in payments from the Health Ministry;

m. the third shell company (BMC, known to law enforcement as UPMC) received approximately $400,000.000 in payments from the Health Ministry;

n. Al Sharaf went on vacation in September 2014;

o. when Al Sharaf returned from her vacation, she wanted to know who signed the checks in her absence, to which UCC-1 replied that another Senior Health Ministry official did;

p. UCC-1 asked Al Sharaf how she wanted her money, to which Al Sharaf replied she would tell UCC-1 later;

q. Al Sharaf asked for copies of those checks signed by another Senior Health Ministry official. UCC-1 stated that Al Sharaf told UCC-1 that a committee from the Ministry would be arriving and that the situation had changed;

r. in or about September 2014, UCC-1 learned employees of the Health Ministry were under investigation by the Kuwaiti government for embezzlement;

s. Al Sharaf tried to insinuate UCC-1 implicated her (Al Sharaf) in the embezzlement scheme by having her sign the checks issued to the shell companies;

t. UCC-1 gave Aly 8 pre-signed but blank checks from a shell company to give to Al Sharaf. UCC-1 advised Aly that "the whole amount was not there" because people had taken their money and left;

u. A committee from the Kuwaiti government arrived to investigate the embezzlement in or about September 2014;

v. After the committee arrived, UCC-1 went to a Senior Health Ministry official and confessed to UCC-1's and Al Sharaf's involvement in the embezzlement scheme;

w. Al Sharaf directed other Health Ministry employees to attempt to conceal her involvement in the scheme by changing payment information. Al Sharaf also instructed UCC-1 on what to say to the committee.

C. IDENTIFICATION OF SHELL COMPANIES INVOLVED IN POSSIBLE EMBEZZLEMENT ACTIVITY

18. In connection with this investigation, I conducted a search of the Virginia State Corporation Commission's (SCC) online database. A search for UPMC Global Services revealed a record for UPMC Global Care LLC with SCC identification number S5143021. Records checks revealed UPMC Global Care LLC is a limited liability company incorporated in the state of Virginia. The date of formation and registration is listed as July 9, 2014. The principal office is a residence located in Stafford, Virginia, which was the address of UCC- 1. Walid Aly is listed as the organizer and registered agent of UPMC Global Care LLC.

19. A search for Hopiken Medical in the Virginia SCC online database revealed a record for Hopiken Medical Service INT LLC with SCC identification number S5231164. Records checks revealed Hopiken Medical Service INT LLC is a limited liability company incorporated in the state of Virginia. The date of formation and registration is listed as September 9, 2014. The principal office is a residence located in Lorton, Virginia, which is believed to be the address of an individual whose identity is known to law enforcement herein referred to as Unindicted Co-Conspirator 3 (UCC-3). The registered agent is listed as UCC-3.

20. A search for Hopiken Medical revealed a record for Hopiken Medical Service, LLC with department identification number W15759335. Records checks revealed Hopiken Medical Service, LLC is a limited liability company incorporated in the state of Maryland. The date of formation and registration is listed as March 20, 2014. The principal office is located in Baltimore, Maryland. The registered agent is listed as an individual who is known to the government as Unindicted Co-Conspirator 4 (herein referred to as UCC-4). A review of the

Articles of Incorporation indicates Hopiken Medical Service LLC was formed to provide medical transportation services.

21. On February 18, 2015, I received and subsequently reviewed the Articles of Organization for Hopiken Medical Service INT LLC from the Virginia SCC. The Articles of Organization identified UCC-3 as the resident agent of Hopiken Medical Service INT LLC. The Articles of Organization indicated Hopiken Medical Service INT LLC's registered office is located in Lorton, Virginia, which is the residence address of UCC-3.

22. On February 19, 2015, I conducted a search of the Maryland Department of Assessments and Taxation Business Services online database. A search of UPMC Global Services revealed a record for UPMC Global Services LLC with department identification number W16035115. Records checks revealed UPMC Global Services LLC is a limited liability company incorporated in the state of Maryland. The date of formation and registration is listed as August 18, 2014. The principal office is located in Silver Spring, Maryland, which is believed to be the residence of an individual known to the government as Unindicted Co-Conspirator 5 (herein referred to as UCC-5). The registered agent is listed as UCC-5.

23. In the course of the investigation, I conducted a search of the Maryland Department of Assessments and Taxation Business Services online database, which revealed a record for Med Star Physician LLC. Records checks revealed Med Star Physician LLC is a limited liability corporation incorporated in the state of Maryland. The principle office is located in Baltimore, Maryland. A review of the Articles of Organization indicates that Med Star Physician LLC was formed to provide transportation services.

D. REVIEW OF BANK RECORDS ASSOCIATED WITH BANK OF AMERICA ACCOUNT NUMBER XXXXXX0454

24. On December 15, 2014, I subpoenaed bank records associated with Bank of America bank account number XXXXXX0454. Bank of America bank account number XXXXXX0454 is identified as being associated with the Kuwait Health Office, Embassy of Kuwait. A review of records associated with the account revealed the Health Ministry is located at 4301 Connecticut Avenue, NW, Suite 300 in Washington, D.C. a Senior Health Ministry official and Hanan Sharaf (Deputy Health Attaché for Finance) were identified as signatories on the account.

25. A review of checks authorizing payment from the Health Ministry's bank account revealed payments with the following payees:

a. Med Star Physician LLC – Baltimore, Maryland

b. UPMC Global Service – Baltimore, Maryland

c. Hopiken Medical Services – Baltimore, Maryland

d. MedStar Health TS – Baltimore, Maryland

e. Hopiken Medical Services Int – Baltimore, Maryland

26. A review of payments originating from the Health Ministry's Bank of America bank account to established health care providers revealed payments to Johns Hopkins Medicine, MedStar and UPMC Global Care. A review of the address information associated with these payments and open source public information indicates Johns Hopkins Medicine, MedStar and UPMC Global Care are established entities that provide legitimate medical services.

27. The Bank of America bank account records reviewed to date revealed that several checks issued by the Kuwait Health Ministry were deposited into bank accounts belonging to the shell companies.

E. REVIEW OF BANK RECORDS ASSOCIATED WITH THE SHELL COMPANIES

28. A review of bank records associated with the Health Ministry bank account revealed multiple checks payments to DBA MedStar Health & Transportaion Services.[1] Bank of America bank account number XXXX-XXXX-4951 is opened in the name of DBA MedStar Health & Transportaion Services. According to bank records, DBA MedStar Health & Transportaion Services is a sole proprietorship under the control of Hussein F. Osman. The bank account was opened in January 2014.

29. The following list contains a sample of payments made from the Kuwaiti Health Ministry to DBA MedStar Health & Transportaion Services during the period from at least January 2014 through June 2014 during the conspiracy:

| **Date (On or About)** | **Account Holder** | **Amount** |
|---|---|---|
| 01/22/2014 | DBA MedStar Health TS | $5,830.00 |
| 02/06/2014 | DBA MedStar Health TS | $8,363.00 |
| 03/08/2014 | DBA MedStar Health TS | $8,588/06 |
| 03/21/2014 | DBA MedStar Health TS | $9,487.06 |
| 04/07/2014 | DBA MedStar Health TS | $6,162.52 |
| 04/08/2014 | DBA MedStar Health TS | $5,596.15 |
| 04/10/2014 | DBA MedStar Health TS | $6,860.62 |
| 05/06/2014 | DBA MedStar Health TS | $48,187.50 |
| 05/15/2014 | DBA MedStar Health TS | $42,187.50 |
| 05/17/2014 | DBA MedStar Health TS | $38,187.50 |
| 05/21/2014 | DBA MedStar Health TS | $41,687.50 |
| 06/30/2014 | DBA MedStar Health TS | $32,341.90 |
| 06/30/2014 | DBA MedStar Health TS | $25,222.60 |
| 07/01/2014 | DBA MedStar Health TS | $38,000.00 |

30. A review of the Bank of America bank records for the account opened in the name of DBA MedStar Health & Transportaion Services revealed that checks drawn on this shell company account were signed by Osman. The signature appears to be the same as the signature Osman provided to the Bank in the account opening documents. These checks signed by Osman

[1] The account was spelled "DBA MedStar Health & Transportaion Servi" [sic] on the account opening documents and checks.

were in turn deposited into the accounts of other members of the conspiracy. The following list contains a sample of payments made from the DBA MedStar Health & Transportaion Services account to accounts controlled by other people who are believed to be members of the conspiracy:

| Date of Check (On or About) | Amount | Payee |
|---|---|---|
| 02/05/2014 | $2,000.00 | UCC-2 (related to Osman) |
| 03/10/2015 | $2,100.00 | UCC-6 (related to UCC-1) |
| 03/10/2014 | $4,300.00 | UCC-6 (related to UCC-1) |
| 04/08/2014 | $2,400.00 | UCC-2 (related to Osman) |
| 04/09/2014 | $3,000.00 | UCC-3 |
| 04/12/2014 | $3,000.00 | UCC-1 |
| 04/18/2014 | $2,600.00 | UCC-3 |
| 05/07/2014 | $15,000.00 | UCC-1 |
| 05/07/2014 | $17,000.00 | UCC-1 |
| 05/07/2014 | $11,000.00 | UCC-6 (related to UCC-1) |
| 05/15/2014 | $3,000.00 | UCC-7 (related to Osman) |
| 05/15/2014 | $2,800.00 | UCC-7 (related to Osman) |
| 05/16/2014 | $14,000.00 | UCC-1 |
| 05/16/2014 | $8,000.00 | UCC-2 (related to Osman) |
| 05/17/2014 | $11,000.00 | UCC-6 (related to UCC-1) |
| 05/28/2014 | $4,000.00 | UCC-8 (related to Osman) |
| 06/03/2014 | $6,150.00 | UCC-2 (related to Osman) |
| 06/03/2014 | $4,000.00 | UCC-2 (related to Osman) |
| 06/04/2014 | $21,000.00 | UCC-1 |
| 06/04/2014 | $20,000.00 | UCC-6 (related to UCC-1) |
| 06/10/2014 | $10,000.00 | UCC-1 |
| 06/20/2014 | $2,000.00 | UCC-1 |

31. A review of the Bank of America bank records for the account opened in the name of DBA MedStar Health & Transportaion Services revealed the following cash withdrawals:

| Date (On or About) | Amount |
|---|---|
| January 23, 2014 | $3,000.00 |
| March 24, 2014 | $3,749.00 |
| March 26, 2014 | $3,150.00 |

32. A substantial portion of the funds deposited into the DBA MedStar Health & Transportaion Services account were in turn withdrawn within a short time period, through the issuance of checks or through cash withdrawals leaving little money for expenses which an operating business would be likely to need to anticipate covering on an on-going basis.

33. Most of the withdrawals from the account of DBA MedStar Health & Transportaion Services for the entire period from January 2014 to July 2014, when the account was closed, do not appear to be related to the expenses which a transportation services company would be expected to incur. For example, there appear to be no substantial payments for telephone service, gas, insurance for vehicles, auto purchases, leasing or repairs, or tax or social security withholdings for any employees. Additionally, there are no check deposits which appear to be from any other purported customer of transportation services other than the Kuwait Health Ministry.

## VI. CONCLUSION

34. Based on the above described facts, there is probable cause to believe that Osman knowingly conspired with other individuals employed by the Kuwaiti Health Ministry in Washington, D.C. as well as other individuals known and unknown to violate of Title 18, United States Code, Section 1956(h). Specifically, Osman and other individuals knowingly conducted

financial transactions with property representing the proceeds of the specified unlawful activities of bank fraud (18 U.S.C. § 1344(2)) and wire fraud (18 U.S.C. § 1343) knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity in violation of 1956(a)(1)(B)(i) and that the criminally derived property involved in several transactions was of a value greater than $10,000 and was derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

__________________________________
Brendan M. Shelley, Special Agent
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

__________________________________
ALAN KAY, MAGISTRATE JUDGE
UNITED STATES DISTRICT JUDGE

Sworn to and subscribed to before me
this_____ day of May, 2015